### Charlotte D. Lord *vs.* Town of Litchfield.

The statute of 1702 with regard to gifts for charitable uses provides that all lands and estates that have been or shall be given by the General Assembly or by any town or person for the maintenance of the ministry of the gospel or for any other public and charitable use, shall forever remain and be continued to such use, and shall be exempt from the payment of taxes. Held that this statute did not constitute a contract between the State and either the donors or the donees of such charitable gifts, that the property so given should forever be exempt from taxation, and that therefore a statute making it taxable in certain cases was not unconstitutional.

If to be regarded as such a contract, a lease of the property for 999 years for a gross sum, without a reservation of rent, would be such a violation of the condition of the contract that the State would no longer be bound by it.

The case of *Landon* v. *Litchfield*, 11 Conn., 251, overruled. Also the cases of *Atwater* v. *Woodbridge*, 6 Conn., 223, and *Osborne* v. *Humphrey*, 7 Conn., 335.

The present suit was brought by the owner of lands claimed to be exempt from taxation under the act of 1702, to recover money compulsorily paid for such tax. The land in question was the same land held in the case of *Landon* v. *Litchfield* to be exempt from taxation under that statute, and the sole question in the present case was as to its liability to taxation. An act had been passed in 1859, since that decision, making such lands taxable where conveyed to other parties and no longer productive of income to the original donee, as was the case with the lands in question. Held that the judgment in the case of *Landon* v. *Litchfield* did not estop the defendants from claiming the lands to be taxable, 1st, because the record in that case did not show that that precise point was decided, and 2d, because the act of 1859 made the question a different one, it then being as to the liability of the land to taxation under the law of that time and now as to its liability under the law of the present time.

A statement of the facts of a case by a judge of the Superior Court for the purpose of reserving the case for the advice of the Supreme Court, is not a part of the record in the case.

ASSUMPSIT for money paid, to recover the amount of certain taxes paid under compulsion and claimed to have been illegally laid. The Superior Court found the following facts.

The original deed from a committee of the towns of Hartford, Windsor, and certain inhabitants of Farmington, dated April 27, 1719, granted to the first settlers of the town of Litchfield, among other things, " three home lots with the divisions of land to be laid out thereunto, and the whole of said three lots to be three-sixtieth parts of the whole plantation, to be and remain for the uses following, and no other use and purpose whatsoever, namely,—one home lot, with the divisions and commons thereto pertaining, to be given and granted to the minister that shall be first ordained in the said plantation by the choice and approbation of the major part of the inhabitants thereof, to be and remain to him and his heirs forever; one lot, with the divisions and commons, to be and remain forever to and for the use and improvement of the said first minister and his successors in the work of the ministry in the said place ; and the other of said three lots to be and remain forever to be improved by the inhabitants of the said plantation to the best advantage, for the support and maintenance of the school for the well educating of the children in the said place."

In 1745, under the second clause of the foregoing extract, a piece of land situated on the east side of North street, in the village of Litchfield, containing thirty-six acres, was " surveyed out to the ministry."

At a meeting of the inhabitants of Litchfield, February 26th, 1753, it was " voted to give Rev. Judah Champion a call to settle among us in the ministry." Also " voted to give to Mr. Champion £2,000 in old tenor money for his settlement, and £800 per annum old tenor money for his salary, provided he settle as a minister."

At a meeting holden June 14th, 1753, it was " voted, to lease out so much of the parsonage right of land for nine hundred and ninety-nine years as to answer and pay the set-

tlement already voted to Mr. Champion," and a committee of three was appointed to execute the lease.

The following lease to Mr. Champion was executed by the committee :

"To all people to whom these presents shall come—Greeting : Know ye that we, Ebenezer Marsh, Edward Phelps and Supply Strong, of the town and county of Litchfield, in the colony of Connecticut, being chosen and appointed a committee by the inhabitants of the said town to lease to the Rev. Judah Champion the home lot and twenty acres joining laid out on the right of land called the parsonage right, in said Litchfield, for and in consideration of the said Judah Champion's settling in the said town as a gospel minister : We, therefore, as committee aforesaid, for the consideration aforesaid, do demise, lease, and to farm let, to him the said Judah Champion, his heirs and assigns, for and during the full term of nine hundred and ninety-nine years from and after the 4th day of July, A. D. 1753, the said home lot and twenty acres joining laid out on the said right, and bounded according to the survey bill thereof as follows, [describing it.] To have and to hold said demised and leased premises with all the privileges and appurtenances thereof unto him, the said Judah Champion, his heirs and assigns, to his and their own proper use, benefit and behoof, for and during the full term of time aforesaid. And we, as committee aforesaid, do hereby covenant and promise to and with the said Judah Champion, his heirs and assigns, to warrant and defend the said leased premises and appurtenances to him, the said Judah Champion, his heirs and assigns, during the full term of time aforesaid against all claims and demands. Witness our hands and seals, the fifteenth day of January, in the 27th year of his Majesty's Reign, George the Second of Great Britain &c., King, Annoque Domini 1754."

Mr. Champion accepted the lease in part payment of his settlement, and held possession of the tract of land under it, (continuing in the work of the ministry,) from the date thereof to the time of his death, in October, 1810. He devised the land to John R. Landon, who also went into possession

of the same, and by sundry intermediate conveyances the title which Mr. Champion and Landon had to the land came to and vested in the plaintiff. The plaintiff's deed is dated May 3d, 1858, and from that time to the present she has been the owner of the land.

All the clergymen who were settled in the town while it continued one ecclesiastical society, and all who have been settled in the first ecclesiastical society of the town since the same was divided into different societies, have been settled in the work of the ministry upon certain stipulated settlements and salaries, according to contracts made between the town or the first ecclesiastical society on the one hand, and said clergymen on the other, which salaries and settlements have been fully paid by the town and society, and received by said clergymen in full compensation for their services. Neither the town nor society receives, or has ever received, any annual income or rent from the premises.

In the year 1833, while said Landon was in possession of the land, the town laid a tax thereon against him, and caused the same to be collected of him. He immediately after brought an action against the town to recover back the money so paid. The case went to the Supreme Court, and is reported in 11 Conn. R., 251. In the present case the plaintiff set up in her pleadings that judgment and claimed it to be a bar to the present suit. The record, which was introduced in evidence, showed merely a declaration in general assumpsit, a plea of the general issue, and the clerk's record of the judgment. There was with the file a statement of the case by the judge of the Superior Court who heard it and a reservation of sundry questions arising on the facts, the principal one being as to the liability of the land to taxation, for the advice of the Supreme Court; but it did not appear otherwise what was decided in the case.

In the several years mentioned in the plaintiff's bill of particulars in the present case the defendants laid a tax on the land against the plaintiff, and on the 4th day of December, 1867, caused the sum of $141.81 to be collected of her in payment thereof, including interest and incidental expenses.

Upon these facts the court reserved the questions arising in the case for the advice of this court.

*Hubbard* and *Andrews,* for the plaintiff.

1. It is plain from the terms of the original deed of 1719 that the grantors contemplated the incorporation of a town, and that the town when incorporated should be the party beneficially interested in the grant of the second lot, or, at any rate, that the town should be the owner of the legal estate therein. Such construction was put upon the grant by contemporary usage, it is in accordance with precedent, and it was expressly so decided in *Landon* v. *Litchfield,* 11 Conn., 251. See also *Jackson* v. *Murray,* 7 Johns., 5 ; *Vandyck* v. *Van Beuren,* 1 Caines, 84 ; *England* v. *Slade,* 4 T. R., 682 ; *Huntington* v. *Carpenter,* Kirby, 45 ; *Camp* v. *Camp,* 5 Conn., 291. The primary intent of the grant of the three lots was to aid the infant plantation ; to enable them to settle a minister and establish and maintain a school, and thereby to induce a more speedy settlement of the place, and the second lot being for the " maintenance of the ministry of the gospel " was exempt from rates and taxes under the statute of 1702.

2. The privilege of exemption from taxation by the statute of 1702 was in the nature of a contract which the legislature could not rescind. Immunities, dignities, offices and franchises are in law deemed valuable rights, and whenever they are the subject of a grant they are just as much within the reach of the constitution as any other grants. *Dartmouth College* v. *Woodward,* 4 Wheat., 518, 699. Besides, this point has been too frequently decided by this court to be now an open question. *Atwater* v. *Woodbridge,* 6 Conn., 223 ; *Osborne* v. *Humphrey,* 7 id., 335 ; *Parker* v. *Redfield,* 10 id., 490 ; *Landon* v. *Litchfield,* 11 id., 251 ; *Hart* v. *Cornwall,* 14 id., 228. " In view of these repeated adjudications the mind is at a loss to conceive what object is proposed by again agitating this question. Is it that decisions are to be regarded as of no binding authority, and that the maxim *stare decisis* has become too antiquated and time-worn for modern application ? We think it of some importance that unifor-

mity of decision should be preserved; and that the profession, at least, should be able to determine, with some degree of accuracy, what is the law upon a given point." BISSELL, J., in *Landon* v. *Litchfield*. Particularly since the decision of *Landon* v. *Litchfield* may this plaintiff claim that she has such a vested right to this immunity from taxation *by contract*, and a contract to which the government of the state is a party, that she cannot be divested of it by any act of the legislature.

3. The lease for 999 years for a single sum was not a misapplication of the gift, neither was it in fraud of the statute of 1702, nor in fraud of the donors. 1st. It was not in fraud of the donors, because they expressed in the deed as its consideration, " the encouragement of the first settlers of the plantation, " and the grantees applied the gift in the most advantageous way; in fact in the only way by which it was possible for them to derive any present benefit from it. With thousands of acres of unoccupied land on every side of them, the imagination is tasked to discover what "encouragement" the first settlers could have found in this gift, if they had been required to depend alone on its annual income or rent. 2d. It was not in fraud of the statute. Our ancestors regarded the ministry of the gospel as a main pillar of the state and the obvious design of the statute of 1702 was to induce donations which would assist the infant towns and societies *at once* to support a minister. The statute contemplated a present benefit to the donees in each case. The remote advantage to prosperity was merely incidental. The charity of legislatures, as well as of individuals, begins at home. 3d. For the same reasons the lease was not a misappropriation of the fund. *Osborne* v. *Humphrey*, supra.

4. Even admitting that the lease to Mr. Champion was in fraud of the statute, or that it was a misappropriation of the gift, the legislature would then have no right to rescind the exemption. In such case the duty of the state would be to enforce through its judicial power a proper administration of the trust. *Dartmouth College* v. *Woodward*, supra: 1 Kent Com., 417. The town, or the first ecclesiastical society, is

still the owner of the land and the trustee of the fund, and there has been no attempt to alienate the title or to abandon the trusteeship. Indeed, every presumption must be that such rights are still claimed and will be asserted at the first opportunity. While they subsist a proper application of the fund can be enforced by proceedings in equity. The only alternative is for this court to decide that the town and the society have absolutely parted with their entire title in the premises. *Landon* v. *Litchfield,* supra; *New Haven* v. *Sheffield,* 30 Conn., 160; *Brainard* v. *Colchester,* 31 id., 407; *Goodwin* v. *Goodwin,* 33 id., 314.

5. The statute of 1821, so far as it undertook to deprive the plaintiff's land of its exemption from taxes, has been decided to be unconstitutional. It would be strange indeed, if the legislature in 1859 could deprive her of this exemption indirectly, when they could not do it directly in 1821, and the more so as the circumstances of her case have remained precisely the same ever since the decision of *Landon* v. *Litchfield* that they were then.

6. But the precise question now in issue has already been litigated between these parties and decided. The taxes which the plaintiff is now seeking to recover back were laid upon the very tract of land which it was decided in the case of *Landon* v. *Litchfield* was not liable to taxation. The plaintiff is privy in estate to John R. Landon, and so a party to the judgment. Coke Litt., 352a; 1 Greenl. Ev., §§ 189, 528; 1 Phill. Ev., 324; Broom's Leg. Maxims, 248. The defendants are therefore estopped by that judgment to claim that the land is taxable. A right once litigated and decided can never be called in question again. Such former judgment is forever conclusive. It cannot be necessary to cite authorities on this point, for if there be any one principle of law settled beyond all question, it is this.

*O. S. Seymour* and *G. C. Woodruff,* for the defendants.

1. The land is not exempt from taxation on the ground that the statute of 1702 constitutes a contract between the state and the donors. Whatever may have been said on the

subject in the various cases where this statute has been considered by the court, the whole reason of the thing is against that view.

2. It is liable to taxation because " it does not remain to the use to which it was granted." Stat. 1702. The object of that statute was not to exempt the land from taxation, but to confirm it to the use specified. *Atwater* v. *Woodbridge*, 6 Conn., 230.

3. The case of *Landon* v. *Litchfield*, 11 Conn., 251, has been overruled by the cases of *New Haven* v. *Sheffield*, 30 Conn., 160, and *Brainard* v. *Colchester*, 31 Conn., 407.

4. In 1859 the legislature passed an act providing that when the society does not receive rent, or when the conveyance is intended to be perpetual, the estate shall not be exempt from taxation. Gen. Statutes, p. 707, sec. 6. In this case it is found that the society receives *no rent*, and it appears from the lease that it was intended to be a *perpetual conveyance*. That statute is constitutional. *Brainard* v. *Colchester*, 31 Conn., 407.

5. The judgment in *Landon* v. *Litchfield* is no bar. That action was assumpsit, and the issue non-assumpsit. During the pendency of the cause the defendant was defaulted, and judgment was rendered on such default. It does not appear that the Court of Errors gave any advice to the Superior Court. Judgment was not rendered in conformity with such advice. And the finding of the Superior Court in that case is no part of the record. *Chambers* v. *Campbell*, 15 Conn., 427. But if it were part of the record the record would still be inadmissible ; because, the suit was not between the same parties; the cause of action was not the same ; the fact now in issue was not directly decided, at most only collaterally ; and the right of Mr. Landon to hold the estate exempt from taxation was never settled by a judgment. *Church* v. *Leavenworth*, 4 Day, 274 ; *Canaan* v. *Greenwoods Turnpike Co.* 1 Conn., 12; *Cowles* v. *Hart*, 3 id., 516 ; *Smith* v. *Sherwood*, 4 id., 276 ; Swift Ev., 17 ; 1 Swift Dig., 752, 755 ; Roscoe's Dig., 160. But if the judgment settled Mr. Landon's rights it is not conclusive, because the rights of the parties were

materially altered by the act of 1859. The rights of the parties depend on the law at the time the taxes were laid.

CARPENTER, J. The statute of 1859 provides that " whenever any ecclesiastical society, or any public or charitable institution, shall have leased or otherwise conveyed any real estate, from which said society or institution does not receive an annual income˜or rent, or where such conveyance is intended to be a perpetual conveyance, such estate shall not be exempt from taxation." The court below has found that neither the town of Litchfield, nor the ecclesiastical society, has ever received any annual income or rent from the property here in question. The case then is brought within the language of the act, and must be governed by it, unless the statute, so far as it was designed to affect this class of cases, is inoperative, for the reason that it impairs the obligation of a contract. In *Brainard* v. *Colchester*, 31 Conn., 407, it was held by this court that the act was not unconstitutional. We are not disposed to question the correctness of that decision. The reasons given for it, however, would seem to indicate that that case was not within the purview of the act of 1702, inasmuch as the conveyance in that case defeated the end sought to be accomplished by the statute. A careful examination of the present case has led us to the conclusion that it stands substantially upon the same ground. We are aware that this question, in its application to this identical land, was decided in *Landon* v. *Litchfield*, 11 Conn., 251, in accordance with the plaintiff's claim. But that decision was by a divided court, and was virtually overruled by the case of *Brainard* v· *Colchester*. It is not therefore binding upon us, but we are at liberty to decide this case upon principle.

The statute of 1702, so far as it relates to the present inquiry, is as follows : ".That all such lands, tenements, hereditaments and other estates, that either formerly have been, or hereafter shall be, given and granted, either by the General Assembly of this Colony, or by any town, village or particular person or persons, for·the maintenance of the ministry of the gospel in any part of this Colony, or schools of learning, or for the relief of poor people, or for any other public and charitable

use, shall forever remain and be continued to the use or uses to which such lands, tenements, hereditaments or other estates have been or shall be given and granted, according to the true intent and meaning of the grantors, and to no other use whatsoever; and shall also be exempted out of the general lists of estates and free from the payment of rates."

It is obvious from an inspection of the statute that its chief object was to secure the estates therein named for the uses and purposes intended by the grantors, and to prevent their misapplication to other purposes. *Brainard* v. *Colchester*, supra; *New Haven* v. *Sheffield*, 30 Conn., 160. The exemption from taxation was a secondary matter, and clearly contingent upon the former provision. It has always been the settled policy of the state to exempt from taxation the property of all religious societies. Hence it was the obvious intention of the legislature to exempt it so long as it continued to the uses and purposes for which it was designed; and it is a fair inference that, whenever such property should be diverted from such use, the legislature intended that it should not be so exempt. In this case the lands granted remained in the hands of the society from 1719 to 1753. In the latter year the Rev. Mr. Champion was settled over the society, in consideration of a gross sum, £2000, and an annual salary of £800. The former sum was paid, in part at least, by a lease of the land in question for 999 years. They, therefore, during the continuance of the lease, parted with their whole interest in the property for a gross sum, and expended the proceeds in paying an obligation resting upon them; so that neither the land nor its avails produced an annual income to the society. If the land had been leased to other parties for cash, and the money had been used to pay an existing debt, it would hardly be claimed that the transaction was not a diversion. The case does not materially differ from the one supposed. The society had contracted to pay £2000, and leased the land in question to raise money for that purpose. The circumstance that the party to whom the money was due agreed to take the land in lieu of money cannot change the nature or character of the transaction. It was doubtless

supposed that the society had no power to sell, and that a conveyance in fee would work a forfeiture of the estate. Hence a long lease was resorted to. Nevertheless, for all purposes involved in the present inquiry, it was a practical sale, and contrary to the letter and spirit of the act of 1702. We think therefore, notwithstanding the case of *Landon* v. *Litchfield*, that the implied condition contained in the act had not been kept, and consequently that the land ought not to be exempt from taxation. Such in effect is the decision in *Brainard* v. *Colchester*, and we may safely rest our decision upon the authority of that case.

But we think the constitutionality of the act of 1859 can be vindicated upon higher grounds; and as the question is an important one, in which many towns in the state are particularly interested, we feel constrained to go further and express at length our views and conclusions upon that branch of the case. We are clearly of the opinion that the act of 1702 is in no sense a contract. A public as well as a private statute may form the basis of a contract. In either case, as in contracts between individuals, there must be all the essential elements of a contract;—a subject matter—parties capable of contracting—a good and sufficient consideration—and an actual contract or agreement of minds. If any one of these requisites is wanting, there is no more reason for holding the state bound by the transaction than there would be for holding an individual bound under similar circumstances.

It may be useful, in the first place, to inquire who is the party with whom the state is supposed to have made a contract? Was it with the grantors or the society? If the former, then, inasmuch as the immunity did not attach to the land until after the title passed from them to the society, it is manifest that the plaintiff is not in privity with either of the contracting parties; and being neither party nor privy to the contract, it is difficult to see what right she has to derive any advantage from it, or what reason she has to complain of its violation, if indeed it has been violated. If such a contract in fact exists, perhaps the heirs or successors of the grantors might, if a proper case should arise,

insist upon the fulfillment of the contract by the state. But
how is such a case to arise ? The grantors parted with all
their interest in the property absolutely. Exemption from
taxation will not benefit them or their successors, and on the
other hand taxation will not injure them. In fact they have
not the slightest interest in the question. Again, regarding
them as the party, what evidence is there that exemption from
the payment of rates had the slightest influence upon their
minds ? Their sole motive was to benefit the grantees. The
donation in their hands would be slightly enhanced in value
by the operation of the statute ; but that was a mere incident,
and there is hardly room for presuming that it had any per-
ceptible influence. The property they parted with was the
same in value to them whether taxable or otherwise ; and we
have no reason to suppose that they would have parted with
it any sooner in the one case than the other. These consid-
erations show pretty conclusively, in the first place, that there
was no contract in fact with the grantors ; and in the second
place, if the transaction can in any sense be viewed in the
light of a contract, that the plaintiff is a stranger to it and
cannot enforce it.

But if it be claimed that the town or society is the other
contracting party, then the plaintiff encounters another diffi-
culty which is equally fatal to her claim ; and that is this,
that there is no consideration to support the contract. It will
not be pretended that the state received any advantage, direct
or indirect, which can be regarded as a sufficient legal consid-
eration. The grantees parted with nothing of value, they
contracted to do nothing, and there was no agreement, ex-
press or implied, on their part, which can be treated as a
consideration for the undertaking of the state. It may be
said that the consideration moved from the grantors. If it
could be made to appear that the exemption was intended to
induce gifts of this kind, and that the conveyance was actually
made in consideration of such exemption, there would be force
in this claim. But if the statute was not intended or designed
for any such purpose, and the grantors parted with their
property, as they certainly may have done, upon other consid-

erations, independent of that, it would be going too far to hold that the grantor's deed was a sufficient consideration for the act of the state. One reason is that neither party, so far as we know or can know, in the day and time of it looked upon the transaction in that light. The exemption was purely a gratuity, given and accepted as such. To give it the force and validity of a contract, beyond the reach of subsequent legislative control, is going farther than any adjudged case has gone, aside from the cases above referred to. Before we can give such effect to a statute we ought to be satisfied, without the aid of presumptions, that the parties so intended it. No such intention appears in this case, and the presumptions are the other way.

But there are other considerations, arising from the motives which prompted the act of 1702, and from the language of the act itself, which confirm us in the view we take of this question. It will be conceded that the design of the legislature was to benefit, not the grantees of the society, but the society itself. It would seem to follow, as a necessary consequence, that the exemption attached to the title of the society, and not to the land. If therefore the society sell the land, and with the avails create a permanent fund, from which an annual income is derived, the fund should be exempt from taxation, and not the land. Otherwise the manifest intention of the legislature would be defeated. It will hardly be claimed that both the fund and the land should be exempt, as that would be a double exemption, neither intended nor contemplated by the legislature. But suppose the society, instead of investing the money in a permanent fund, exhaust it, as in this case, by the payment of a debt. In such a case the exemption must attach to the land or nothing. If it does so attach, and not in the case of a permanent investment, then we come to this result, that the land would or would not be exempt, according as the society used its avails for one purpose or another. It would seem to be trifling to impute to the legislature any such intention. The immunity, if it attached to the land at all in the hands of the purchaser, cannot be affected by any subsequent act of the society. It may

be suggested, in the case last supposed, that the society received all the benefit the legislature intended, in the enhanced price of the land, and that the purchaser, by paying a larger price, has purchased the exemption, and therefore it is reasonable that he should enjoy it. A perfect answer to this is, that the legislature did not contemplate a sale for any such purpose, but, on the contrary, the chief object was to prevent such a disposition of the property. They intended that land, or other estates so given, should be and remain a permanent source of revenue. That intention is defeated in the case supposed, as we have attempted to show, and therefore the purchaser has no legal or equitable claim to the exemption.

But again, the statute in terms applies to land previously given, as well as to that given subsequently. It cannot be successfully claimed that any contract exists in respect to such donations; certainly none with the donors. This would seem to be too clear for argument. However this may be, the point was substantially decided by the Supreme Court of the United States, in *Armstrong* v. *The Treasurer of Athens County,* 16 Peters, 281. It appears in that case that in the year 1804 the legislature of Ohio by statute exempted from taxation *forever* certain lands previously granted by Congress for the purpose of founding a university in that state. In 1826 the legislature authorized the board of trustees to sell the land in question upon certain terms, but the act was silent in respect to the matter of taxation. The court held, affirming the decision of the Supreme Court of Ohio, that the land was taxable in the hands of the purchasers. If this point is established it is certainly true that the act in question is not a contract in respect to a part of the property therein referred to. In respect to the other part we ought to give the statute the same interpretation, unless its language, or the nature of the case, requires a different construction. We see no reason for construing the statute as meaning one thing when applied to one piece of property and another thing when applied to other property.

There is another feature of this statute which deserves particular attention. It expressly applies to all property which

had been, or which should thereafter be, granted by the General Assembly of this state. Now upon the supposition that the contract contended for was with the grantors,—and that is the ground of the decisions of this court in *Atwater* v. *Woodbridge*, 6 Conn., 223, and *Osborne* v. *Humphrey*, 7 Conn., 335, cases upon which *Landon* v. *Litchfield*, rests,—we are driven to the necessity of holding that the state entered into a contract *with itself*, and pledged its faith *to itself*, that such property should never be taxed. If the statute applied only to cases of this description, no one would contend that it was a contract which tied up the hands of succeeding legislatures.

On the whole, we think it reasonable, and the only reasonable course, that the statute, in relation to all the property named in it, should receive the same construction; that the legislature intended to place all such property upon the same footing. That can only be done by rejecting the idea of a contract.

We will close this branch of the case by a reference to the language of Judge Bissell in *Parker* v. *Redfield*, 10 Conn., 495. In speaking upon this question, and in relation to the cases of *Atwater* v. *Woodbridge*, and *Osborne* v. *Humphrey*, he says:—" Were this now an open question we might well doubt whether it be in the power of one legislature by a general law to tie up the hands of succeeding legislatures; and whether a statute, exempting a particular species of property from taxation, is in the nature of a contract of perpetual obligation." It is true he yielded to the authority of those cases; but as that authority is somewhat shaken by *Brainard* v. *Colchester*, we have felt at liberty to examine the question upon principle, and upon such examination, being satisfied that those decisions are not founded in correct principles, we feel constrained to disregard their authority and to declare the law to be otherwise.

The plaintiff claims that the judgment of the Superior Court in *Landon* v. *Litchfield* estops the defendants from making this defense. To render a former judgment conclusive on any matter it is necessary that it should appear that the precise point was in issue and decided, and that this should appear

from the record itself. *Kennedy* v. *Scovill*, 14 Conn., 61, and authorities there cited. The record in that case consists of the declaration, the plea, and the judgment. The declaration was in assumpsit, containing the common counts only, the plea was the general issue, and judgment was finally rendered on a default. It does not appear from the record that the question now involved was put in issue, much less that it was tried and determined. The finding of the Superior Court, which was merely for the purpose of taking the opinion of the Supreme Court upon certain questions of law therein raised, is not, strictly speaking, a part of the record. But even if it is, still, it does not appear that the question was tried and decided in the Superior Court. A judgment by default determines nothing except the plaintiff's right to recover in that action. Notwithstanding that judgment, it was competent for the defendants at any time to assert their right to tax this property, and, if that right was disputed, to have the question directly presented and judicially determined. *Standish* v. *Parker*, 2 Pick., 20 ; *Arnold* v. *Arnold*, 17 Pick., 4. But another conclusive answer to this claim is, that the statute of 1859 has materially changed the legal aspect of the question. The most that can be claimed for the former judgment is, that the land was not taxable as the law then stood. The question involved in the present suit is the right to tax the property as the law now stands.

We advise the Superior Court to render judgment for the defendants.

In this opinion the other judges concurred.